Next in number 23, 929, Nicholson v. Scotia Capital. Let's just wait for all the people to leave the room. Of course, you're on. Okay, Mr. Woofter. Good morning, Your Honors. I'm Daniel Woofter, appearing on behalf of the plaintiff's appellants. I'd like to reserve four minutes for rebuttal, please. This case is the same as platinum and palladium with a different metal. Platinum, like this case, concerned an alleged conspiracy by large banks to manipulate a metals price benchmark so they could reap super competitive profits in both the spot and futures markets for those commodities. In platinum, as here, the plaintiffs alleged that defendants achieved their benchmark manipulation in part by manipulating the spot and futures markets shortly before and during their benchmark setting auction. And plaintiffs in both cases alleged that the manipulated benchmark artificially suppressed the price of their derivatives transactions on the same manipulated exchange throughout the class period. This court held, quote, the exchange plaintiffs suffered a direct injury and thus, quote, are the most efficient enforcers of the alleged antitrust injury in that market and have antitrust standing to pursue claims based on that injury. This court so held in the face of HSBC's argument there, the same one it makes with its co-conspirators here, that the platinum plaintiffs failed to allege antitrust injury because they did not, quote, identify specific instruments traded or the time of day when they were traded, end quote. If this court had been persuaded by the fixing banks argument in platinum, the case would have come out the other way. But the court was not persuaded by that argument in platinum and it is right to reject it. When we say this antitrust case is like... And it's true that there was an argument that maybe there wasn't. But I guess I'd ask this question. So in platinum and palladium, my understanding is that a lot of the plaintiffs were ETFs and they alleged that they had triggering buy and sell thresholds where they would have to make purchases or sales based on the prices in the market. And they said that they exchanged – they traded on those days that there was the manipulation, and they say in their complaint that the price distortion lasted for some hours after the manipulation. Here the allegation – and there were two fixes, right? So you might even think that it's going to last longer because there's an AM and a PM fix. Here there's one fix that takes place after hours, and a lot of the activity in the market is maybe more opportunistic like front-running and other kinds of attempts to make a profit. Why isn't it possible that we don't know for sure? It's easier to conclude in the platinum case that one of the plaintiffs was going to be harmed by the changes in price in the market. And here we need more information about whether you were making purchases at the time that the distortion persisted. Does that make sense? I think what Your Honor is describing is a plausible inference. One can draw from both complaints. But I think a counter-plausible inference and what we allege and show in our complaint – and actually this is why this is an A4CRI case – is that as HSBC highlighted in platinum, the plaintiffs in that case suggested the fixed manipulation lasted only a few hours, as you noted, showed significant rebounds shortly after the fixing. But we allege the opposite here. We think, and our econometric analyses show, and we show for a much larger period of the day, that the manipulated silver fix injected artificiality into the market throughout the trading day and beyond. If I understand it, your argument for that, what you've shown, what you allege, is that the price never rebounded to the pre-fix amount, right? And not just that it never rebounded, but there was only one instance of a manipulation that caused a precipitous price drop and nothing else in the normal market could correct for that throughout the trading day. Where are the allegations to that point, that nothing else in the trading day could explain what you just said? Sure. So this comes from our paragraphs 4 to 11 of the TAC. Defendants rigged the silver fix during the class period by, among other means, coordinated manipulative silver transactions in advance of the daily fixing call. Defendants' use of illegitimate transactions to affect the fixed price also explains why large drop in silver prices observed around the start of the silver fix is both inconsistent with the competitive forces of supply and demand and unexplained by other macroeconomic factors. But I understand that's what leads to the price drop. What does that have to do with persistence? So the persistence, I mean, and that is what I think this court answered in Gelboin. And what I would say about persistence is that, you know, if you trip a runner at the start of the race, I think everyone would agree that even if she wins, that the final score or her final time will be affected by the manipulation that happened at the start of it. And that is what Gelboin was simply recognizing, is that when we're talking about— Well, that's just because we think that a sprained ankle doesn't heal within a very short time. But if you have a lot of trades on a market, you might get back to the equilibrium price pretty quickly. It's just not necessarily the same thing as injuring yourself before a race. I don't think it—I didn't say injury. I said that if another competitor trips that runner, causing a fault at the start of the race, and she gets up and, say, gets to pace, is not injured, and is otherwise able to do what— and this is the example of a normal macroeconomic factor and normal forces of supply and demand, or the runner not being affected by manipulation. But even if she gets to pace and is not otherwise injured, her final time will be longer because of the manipulation that happened at the start. And that's why Gelboin recognizes that when we're talking about plausibility, we would expect a globally revered benchmark to have an effect on the things to which that benchmark applies. And I also think that's why the other plausible inference you can draw from ours being a once-daily fix is actually manipulating a once-daily fix could plausibly affect the market more than manipulating a twice-daily fix, because one would think that people in the market would be waiting to see what happened at the p.m. fixing, even if the a.m. fixing said something different. And as Total Gas explained, when we're talking about the pleading stage, which is where we are, the tie goes to the plaintiffs, or the non-moving party, excuse me. And here, the plausible inference we suggest you can take from the complaint points the other direction. I mean, you're saying we should conclude that there just is a distortion that persists throughout all of the trading. But, you know, don't we have precedent on this point, too? Doesn't Gamma Traders say that we have to pay attention to how long the distortion lasts and when the purchases were made? Absolutely. And what Gamma Traders is an exception to what was happening in Gelboin. I don't think it silently overruled the point in Gelboin, which is that the benchmark persistence was plausible. And here, you know, Gamma is not a benchmark manipulation case. Gamma is about manipulative trading directly in the market using large spoof orders that are canceled immediately moments later once it moves the market. In this case, I take it that it's important that they're doing some kind of manipulation in the market. It's not simply the effect of the benchmark, right? It's also – we said that in the Platinum case that, like, they allege that there was collusive trading in the marketplace to drive down the price and so on. Absolutely. So it's not just the benchmark itself, right? Correct. And we have those allegations here, as we pointed out in the briefing, too. And I'm happy to quote – this is also from the paragraphs 4 to 11 range, where it points to the other allegations that substantiate these statements. Defendants coordinated their manipulative trading activity to maximize its impact on silver prices by, for example, one, conspiring to execute large transactions when they knew the silver market was illiquid. Can I just ask you, in terms of the evidence that defendants were actually trading, affecting the price and the fix through trading, are your allegations just based primarily on your – the data regarding the increase – or the changes in trades, or do you have direct allegations about – in support of the defendants were trading prior to the fix? We actually have the same regression analysis style that the Platinum complaint alleges to show, that it was the defendants themselves making these trades on COMEX from London. And that is – that allegation – Can I just ask, just because sometimes in the brief you use defendants writ large, and I wondered whether we needed to make sure we were clarifying – you're talking about non-fixing banks in what you're about to say, correct? I'm talking about all of the defendants who coordinated to manipulate COMEX. Remember, the manipulation was both the spot price of silver and the price of COMEX derivatives because, you know, that reflects the price of the underlying commodity. You're talking about COMEX trading right now, aren't you? Yes. Okay, and so you're – and you're talking about that with respect – you have allegations with respect to both the fixing banks and the non-fixing banks? Yes, and that is – so placing large spoof bids and offers to create false impression of supply and demand where none existed at paragraphs 261 to 63. And then if you just look at all of the chats, not just among, you know, the defendants – the non-fixing banks do not dispute the conspiracy allegations as to the fixing banks. As for the non-fixing banks, all of the chats we provided in – you know, they show actual evidence of traders at the non-fixing banks working either with Deutsche Bank or HSBC to manipulate silver prices either in the spot or the futures market. And as to UBS and Fortis, for the purpose of influencing the start bid price of the silver fix itself. In other words, to manipulate the price of the silver fix. So as – at least as to UBS and Fortis, we have allegations that go to how they're involved in this conspiracy. And I think – Can I ask about the chart that you reproduced? So it does show the distortion in the price, but then it shows it going back to the trajectory it was on originally. Let's say we thought it was important to have allegations to show that you were trading in the exchange at the time of the distortion. Could you provide those allegations? I think we could, Your Honor. One reason that they're not in the complaint, and this is very simple, is that all of these cases were handed down after the third amended complaint. And in fact, they came down after the initial briefing on the third amended complaint and the motions dismissed. That's why they – all of this round of litigation happened after discovery. Have you sought leave to amend? We haven't because unlike the normal course, this pleading – judgment pleading motion by the defendants was brought after fact discovery closed. If we could have another crack at discovery, we could ask the exchanges if they could provide us the time of our trades. The way that the exchanges work, we just don't have that information. I could ask CME today, I would like to place a trade for silver at this price today, but I will not know when that transaction is consummated, and CME won't tell me. They're the clearinghouse that will execute the trade at some point when there is a trade to be executed. There's no record on your – on the client's – on the plaintiff's side that that chose to have a trade? We don't have that with us. If we were able to reopen discovery and go back to the clearinghouse, we would like to see – Well, if you were in charge of the transaction, you'd be able to say that when it hit a certain price, that's when – Yeah, we would know that it hit a certain price during that day. Yes, and, you know, if this court does not think that our allegations of persistence are sufficient, then we would ask that we would have an opportunity to amend in light of the fact that these five cases that were handed down after the third amended complaint are the reason the district court ended up dismissing our third amended complaint, even though it had previously – it had previously found that our allegations as to the fixing banks were well-pled as to antitrust injury and – as to antitrust injury. The about place only comes down later when we didn't have an opportunity to address those cases, either in our pleading or – But you don't argue for us that the district court error did not allow and lead to amend, do you? No, because the district court errors are so plain that the defendants don't even defend them. Her reasoning in the third amended complaint is that it was impossible to trade on COMEX at the time that the manipulation occurred, and, you know, no one – no one believes that because it's just not true, and it's certainly not – But the futures market was other aspects of COMEX were open 23 hours a day. Is that the idea? COMEX was just open for global trading online 23 hours a day, a domestic exchange. And back to Judge Nathan's point earlier, I wanted to say that the econometric analysis that I was referring to that was relied on by the plaintiffs in Platinum and that we rely on here is that it shows a local spike in trading volume on COMEX exchange happening in London right in the lead up to and during the silver fix. We have that allegation in the complaint. That allegation is in the Platinum third amended complaint. And that was sufficient for this court to accept, that it was the banks that were actually placing these manipulative trades on COMEX from London. There, Platinum and Palladium, here for silver. I'll briefly touch on – actually, unless there are further questions. That's fine. You've got time for rebuttal, so we'll hear from you again. Why don't we hear now from the first appellee, Mr. Aaron Renenberg. Aaron Berg, Your Honor. Oh, sorry. I think it's misspelled here, but I appreciate it. Thank you. Good morning to the panel. Stephen Aaron Berg, fellow at Cromwell on behalf of the Fixing Banks. May it please the court. Mr. Aaron Berg, could you raise the podium, please? There's a button on that side. Maybe it's at its – Can you hear me okay? I can speak up if that helps. That would help. Okay. The appellants this morning have tried to wrap themselves in the Platinum case, and I'd like to address sort of why the key issues come out differently under Platinum. And just to start, Platinum does not address injury at all. It just doesn't touch it. And silver, the silver case has always been a case about the silver fix affecting futures, not the other way around. And the Platinum case includes specific allegations that as part of the scheme to manipulate the fix, the defendants were manipulating Comex futures to alter the starting price of the fix. That allegation is nowhere present. But isn't that part of what they're suggesting here? Because they're saying, they're pointing to the increase in trade right before the fix, which is happening at a time when, you know, it's not the prime, I guess, U.S. – the U.S. – it's not the prime U.S. business hours. And so this spike in trades right before the fix, you know, noon London time, that that is suggesting that that's part – they're arguing part that that's what's impacting the fix, not just the actual pre-fix call. So, Your Honor, I think they've made allegations about what's happening in the futures market on the basis of market-wide statistics that are not tailored to the defendants in any way. And they are not alleged to have been designed to alter the starting price in the very express way that the Platinum plaintiffs allege. It's part – You're saying in Platinum there were allegations that they were collusively trading in order to lower the price on the exchange in order to profit. But here the allegations are only that they're exploiting their knowledge of the silver fix in order to profit from the exchange transactions, and that's different. I would say that's – It's less plausible that they necessarily suffered an injury from the activity on the exchange. I think that's right, and I think – But if, in fact, let's say they could produce specific allegations that the banks were trading on the exchange to exploit their knowledge of the fix, whether, you know, it's one of these cover transactions to mask what they're doing or it's some kind of way to exploit the knowledge, and they could show, well, actually, you know, we were the counterparty in this specific transaction, and as a result we had to purchase silver at an artificially inflated price or to sell it at an artificially reduced price, would they then have suffered an antitrust injury? If there were allegations that the defendants were manipulating the COMEX price, and I think the word manipulation is really important, what it means is causing an artificial price and taking a position in a market without the intent or ability to create an artificial price, knowing what's going to happen in a related market is not antitrust injury. That is not manipulation. They are not alleged to have created an artificial price via their futures trading on COMEX. That is nowhere in silver, and I think what's really important – like a front-running transaction, you push the price up a little bit, right? I mean you sort of inflate it somewhat, right? So if they could show that they were a counterparty to one of those transactions, they would show that they suffered an injury because of the defendant's activity, but are you saying that that would still be too disconnected from the antitrust activity? I think if the plaintiffs could plausibly allege that the defendants engaged in a manipulative act, whatever flavor of manipulation you like that causes an artificial price on COMEX, and that they traded at a time when the impact of that artificiality was present in the price, then they have antitrust injury. But your position is that just exploiting your knowledge of the silver fix is not a collusive activity to manipulate or to artificially change the price in the exchange. It's just activity in the exchange. It's not manipulative, Your Honor. It is not there to cause an artificial price and is not alleged to have caused an artificial price in the same way that it is in platinum, where the specific allegation was you move the price down. And Gelboin does not help them in any way. I think we are clearly in the world of total and gamma, and the reason that Gelboin doesn't help them is very simple. If you look at 823 F3rd 768, the euro-dollar futures contracts that were traded in Gelboin, and there are exchange-based plaintiffs in Gelboin, those futures contracts expressly incorporate LIBOR as an element of the settlement price. And that changes everything. It takes away the obligation to plead when you purchased. And the reason for that is very simple. If you buy a euro-dollar futures contract and it has baked into it that the seller will pay the settlement price to the buyer upon settlement, calculated on the basis of three-month LIBOR, and three-month LIBOR has been manipulated, you will be harmed, period, full stop, regardless of what time of day you purchased it or when the manipulation happened. Because it's baked in as a component of price. But your view, then, is the silver fixed price is not? It is absolutely not, absolutely not, and not alleged to be incorporated as a contractual term in the COMEX futures market. Right, but where I was going to continue was not that it's contractual or required, but is it effectively affecting the prices of these contracts? Is there any reason to think that it just has no impact, the silver fixed price? Maybe it has an impact, maybe it doesn't, we don't know, but because it's not contractually written into the price, that that's the distinction you're making? I think it puts it squarely into the world of gamma, where the announcement of the fixed price is like any other form of manipulation, whether it's spoofing, front-running, or whatever you'd like to call it. It is a tradable instrument, right? These are not widgets where the defendants fixed the price at $5 and everyone paid the $5, period, full stop. We don't need to know when you did it. This is a tradable instrument. It's a fluctuating price, and if you're not incorporated in, you're not locked in, then it's just like a spoof. The price comes out. We agree that it's conceivable that that price had an impact on the futures, but the question is when did that manipulation occur, how long did that impact last, and did the plaintiffs trade during that impact period? The manipulation you're referring to, is it the silver fixing, or are you talking about collusive trading on the exchange? The silver fixing, Your Honor. That is the theory of this case. Okay, so if they could show that they actually did trade on the ComEx during the window in which the silver fixing artificially lowered the price, would that be enough? If they could plead, how long, plausibly plead, how long the impact of the fix lasted on ComEx, and they could plead the time that they traded, and it was within that window, they would have antitrust injury. Okay, well, so I just asked Mr. Woofter if they could add such allegations to their complaint, and so if they, in fact, did add allegations about the time of their activity or their trades on the exchange, and they have allegations about the effect of the price on the exchange, would that overcome the objection of the district court? No, Your Honor, for a number of reasons. They've had plenty of opportunities to amend, and they were on notice of this specific issue before, before they filed the third amended complaint. So if we look back to the district court's opinion in this case, in the 12C opinion, at Essay 135, the court recounts how in Silver 1, so this is a decision on the basis of the second amended complaint, the court noted that it was extremely skeptical that plaintiffs could plausibly allege that the anti-competitive effects of defendant's conduct persisted throughout the trading day in the United States, especially because plaintiffs' allegations of persistence are in tension with their allegations that the fixing marked a uniquely dysfunctional period of the trading day, and this is precisely what the plaintiffs continue to ask the court to infer because they do not allege the timing of their trades or provide any facts to allow the court plausibly to conclude that the dysfunction in the market caused by the alleged manipulation of the fix persisted through the end of the trading day in the United States. So you're saying they could have sought timing of trades in discovery and didn't? Oh, they did, Your Honor. We sought the time of their trades in discovery for quite a while and tried to get it, and they told us they didn't have it. They could have gone to COMEX or anybody else during the almost two years of discovery that they had. They knew this was an issue, and they didn't pursue it. So you're saying if they did add these allegations to their complaint and they say what they claim it would say, then they would set a claim, but the district court was not wrong to deny leave to amend because they were on notice of this issue for a long time. That's your position. Not only that, but I believe Mr. Woofter is wrong. The plaintiffs did seek leave to amend, and they did not proffer an amended complaint that included any of the allegations that were necessary to solve these problems, and the court denied it on that basis because they have effectively changed their theory of the case. This case has never been about futures affecting fix. Quite the contrary. Since the day the case was filed, this has been about the fix affecting futures. And we can see that very clearly if you just look back through, for example, JA 474. This is the table of contents of the third amended complaint. And if you want an objective view of what this theory of the case is that isn't subject to post hoc rationalization, look at the table of contents. It says the fixing member defendants by dominating the silver fix controlled the price of silver. The fix price directly impacts the value of multiple silver instruments. Econometric analysis demonstrates that the silver fix causes artificial silver prices. Nothing about the manipulation of futures to affect the fix. Quite the opposite. And the district court, having lived with this case for nine years and presided over discovery disputes and motions to dismiss, is eminently familiar what the theory of this case is. And she said when she wrote her opinion on this 12C at SA 137, the gravamen of plaintiff's claim is quite different. She goes on to say that's not the narrative contained in the complaint. Instead, the narrative in the third amended complaint is that the defendants manipulated a rate setting process in London for London good delivery silver bars, the price of which informed the price of physical silver traded in the United States, and by extension, silver derivatives traded in the United States. Is it right that part of her rationale there is on a premise that futures trading wasn't open on COMEX? No, Your Honor. I think any suggestion that the district court misunderstood the nature of the markets or the trading hours or availability of platforms is dispelled very easily by a review of the court's past opinions. And if you look at the Silver I decision at SA 27, the court noted in that opinion, although plaintiffs argue that the silver fixing is the only factor that goes into determining the price of plaintiff's silver investments, this allegation is, at a minimum, hyperbolic. The silver fixing occurs only once a day at 12 p.m. London time, while silver instruments can be sold, this is important, OTC, 24 hours a day, and via exchanges that have varying hours of operation all around the world. The district court fully understood that this was tradable outside of COMEX pit hours. I find that kind of an extraordinary statement. I mean, I understand you're saying take the big view, look at the other decisions, but in this decision, in, I guess, Fix 3, I mean, there are places where it says things like the fixed quote could not possibly have occurred in a market in the United States because no United States market was open at that time. That seems like a pretty clear statement that that is, in fact, at least partially, what the district court is relying on. And it's not as if that is a single statement within the decision. There are multiple times where reference to the markets not being open being relevant to the conclusion that it's not plausible trades were happening in a domestic market. Your Honor, I think the district court has clearly said that it understands that there is trading available 24 hours a day, 23 hours a day, and in the footnote 18 at, excuse me, SA 147 in the recent opinion, all that the court is saying there is first, in the first sentence, there's no allegation that the defendants were manipulating COMEX in the lead up to the fix, which is before the U.S. trading day. And second, even acknowledging that there is after hours trading available, even acknowledging that, there is no allegation that the defendants were engaging in, quote, early premarket hours, end quote, manipulation. She's acknowledging that there is a 23-hour market, and she's saying, but that's not what they're saying. They're not saying they were engaged in some premarket manipulation through an online platform. That's not the allegation at all. The allegation is here is that they're manipulating the physical price of silver in London to affect the futures price. There's no misunderstanding on the court's part except that she used the word OTC in an overly broad way that included futures. That's all. And you can look back to her earlier opinions to see that she acknowledges that trading is available outside COMEX pit hours. Paragraph 176 explains what she means when she says the trading day in the United States. It's COMEX pit hours. That paragraph says that's where the volume is. And if you look at the chart, that's where the volume is. That's all of the volume in the silver futures market. And that will matter for some of the plaintiffs, maybe. It could. They're doing their trading then. Mm-hmm. Okay. Just real fast, I'll ask each of the counsel. Are you familiar with the Sonterra capital case? I know there's a lot of these.  I confess I listened to the argument, Your Honor, but I'm not deeply familiar with it. Do you have a view on whether we need to hold for that, which our practice is, if there's a case that might impact this decision, we wait for the one that was submitted earlier? Your Honor, I think we would take no position on the sequencing except to say that we think the law is clear as it stands today, that in a case where you have a tradable instrument and the manipulated benchmark is not incorporated into it. Same issue in that case, right? You're in a total and gamma world. Okay. Thank you very much. Thank you, Your Honor. Mr. Ehrenberg will hear for the next appellee, Mr. Feldberg. May it please the Court, I'm Michael Feldberg. I represent non-fixing bank Barclays, and I'm speaking for all five non-fixing banks, Barclays, Fortis, UBS, Bank of America, Merrill Lynch, and Standard Chartered Bank. Appellant's argument relied heavily on Platinum, and I'd simply like to note for the Court that Platinum reviewed the legal sufficiency of claims against fixing members only. Plaintiffs did not pursue previously dismissed claims against non-fixing members. And while in Platinum the plaintiffs, and unlike in Platinum, the plaintiffs here do not allege that the non-fixing banks, or really any defendant, engaged in futures transactions as part of an effort to influence the silver fixing downward, which is a point Mr. Ehrenberg made. Other than that, unless the panel has questions, the non-fixing banks are happy to rest on our briefs. Okay. Thank you very much, Mr. Feldberg. We'll turn back to Mr. Woofter on rebuttal. Thank you, Your Honors. My friend on the other side for the fixing banks starts by saying that unlike in Platinum, where the allegations were exceedingly clear about fix-related manipulation on NYMEX, the allegations here are not based on fix-related manipulation on NYMEX. Or, I'm sorry, on COMEX. And what's interesting is this is entirely different than the way the same defendant framed the case before. In Platinum, this is at page 20 of their brief. Here, though plaintiffs seek to recharacterize their complaint as alleging manipulative conduct on NYMEX, the allegations they point to concern either innocent domestic conduct or alleged misconduct taking place overseas. They raise the same argument about the insufficiency of allegations as to manipulation on NYMEX in Platinum, and this court did not accept that argument, or it would have come out the other way. They also argue here, as they argued in Platinum, that the reason Gilboy— Oh, would that make a difference? So, I mean, quite apart from whether it actually was adequately alleged or whatever, does it make a difference if a complaint alleges manipulation of the market, of the exchange price as part of the scheme, or if it is just activity on the exchange that's exploiting knowledge of the fixing? We don't think it needs to, but for the same reasons this court said that certainly is sufficient in Platinum to show manipulation that's actionable in this context. It did so in light of that argument on the same allegation, and this is at paragraph 267 of our complaint. The chats demonstrate that defendants created the dysfunction in silver prices not only by manipulating the results of the silver fix, but also through their collusive trading that was designed to create and profit from the same price artificiality. That's essentially— So just walk me through. How does it create it? I mean, what happens? You've got trading that produces a decrease in price, and then the fix happens, and the fixing banks, who you allege, are already going to take action to decrease the price. In a practical sense, what's the interaction? How does that work? What does the pre-fix trading do? So what the pre-fix trading do is these are all price inputs for the price of silver. You can affect the price of silver by manipulating the spot price for silver. You can manipulate the price of silver by manipulating the futures market for silver by placing false bids, etc. And what this court said in platinum was, in this case, the benchmark prices are based on the trading activity, each of which conducts precious metals trading in the United States. According to the complaint, the defendants colluded to manipulate the price at which the chair opened the fixing on a given day by placing spoof orders, engaging in wash sales, as well as collusive sharing and acting on non-public information regarding client orders shortly before and during the fixing. Are any of those things you just said just trading activity? Yes. So anything that's like a spoof order would be COMEX, for example, or NIMEX trading activity. Right. But it's spoofing because they're not intending to execute the trade, right? Right. And that is itself a per se manipulative device. You don't have a spoofing allegation here, do you? We do have a spoofing allegation, Your Honor. Against the non-fixing banks? Certainly against the fixing banks and against the non-fixing banks. If you look at the chats, they are talking between either Merrill Lynch. Where's your allegation of spoofing vis-a-vis the fixing banks? Vis-a-vis the fixing banks? Yeah, that's what you just said. Yes. Okay. I thought you were referring to the non-fixing banks. I apologize, Your Honor. As to the fixing banks, our allegations are about the local spike in activity that comes It's trading activity, not spoofing. Yes. Correct. I suppose. So with respect to the – I'll repeat the initial question. With respect to the fixing banks, do you have allegations that are something other than just trading? Yes. So this is at paragraphs 261 to 267. There, the chats show fixing banks speaking to non-fixing banks to coordinate fake orders in – to coordinate fake spoof orders as part of the scheme to manipulate the price of silver. And if – even, you know, so at the very least – and the econometric data that both we rely on here and the plaintiffs relied on in Platton to substantiate that allegation is the same. I quickly want to also tackle, if I may, this idea that the only way Gelboim is applicable is if it directly referenced that – the price. And, you know, I might sound like a broken record, but once again, this is something that HSBC previously argued and that this court did not accept. And that is at pages 48 and 49 of their brief. They argued in Gelboim, this court held that plaintiffs pleaded an antitrust injury when they alleged that they had entered into financial transactions at interest rates that referenced LIBOR. Here, however, plaintiffs do not claim that their transactions expressly incorporated the auction price. They say only that, quote, many physical supply contracts incorporate prices from the fixing, JA 103 emphasis added, without alleging that their contracts did so. This offers no basis to infer antitrust injury. Once again, if this court had accepted that argument, Platton would have come out differently. Can I ask – when I asked Mr. Ehrenberg about the possible amendment, he said that you've been on notice of this since Silver I, about the defect in the – or that the district court was worried about being able to show that you were injured by the collusive activity, and therefore you shouldn't have leave to amend. What do you think about that? So what the – I mean, it's hard to say why we would have leave to amend when what the district court said in Silver I is, while I'm not sure you can show this at the proof stage, and while I think it may be implausible, I accept the allegation is sufficient now. Why would then go back and try to get that proof or amend the complaint when motion to dismiss has been passed? We are now at the proof stage. Separate those two things. I understand the point vis-a-vis amendment, but why wouldn't you get the information for proof? And I wanted to leave open the possibility, but I do not dispute that I'm not sure that that information even exists anymore. CME as a clearinghouse only holds that kind of data. Did you seek it? We sought – no, we sought all information from the clearinghouse that – on the plaintiff's trades, and it wasn't within that. We did not specify timing. We just sought the information regarding the documented transaction, and it wasn't within that information. So neither side has that information. We don't dispute that. And frankly, I think that, you know, this – we only get to this if this court thinks our allegations of persistence are not enough, or even our allegations of persistence through most of the U.S. trading day is not enough, just normal business hours. We show that persistence going at least until 4 p.m. Eastern, which is when the trading day is essentially over. It was almost for silver pit hours at the time. Silver pit no longer even exists. I know I'm well over time. Could I just ask your view on – Of course. Are you familiar with Sonterra and whether it implicates the same issues such that if it does under our practice, we would wait for it? I agree with the other side that I actually don't think Sonterra would answer any of the relevant questions that are disputed in this case. If anything, perhaps Sonterra should be held for this one, but that's not normal circuit practice. So not in this circuit at least. Why do you think it should go in that direction? It's possible. I just think that the case law is clear in this case as to – Second Circuit case law is clear in this case as to how this one should come out. Based on the general principle, you should decide the easier cases first. Sign us up. Far be it for me to tell this panel how to decide its cases. Okay. Thank you very much, Mr. Wuchter. Thank you, Your Honors. The case is submitted.